# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **NOAH L. MORALES** | ) | **DOCKET NO.  20-637** |
| **Plaintiff** | ) | |
| | ) | **Section:** |
| **V.** | ) | |
| | ) | **Judge:** |
| **MONSANTO COMPANY** | ) | |
| **Defendant** | ) | **Magistrate** |

## COMPLAINT

Plaintiff, Noah L. Morales, through undersigned counsel, brings this Complaint for damages against Monsanto Company.

# INDEX

| | | |
|---|---|---|
| I. | PARTIES | 2 |
| II. | JURISDICTION | 2 |
| III. | INTRODUCTION | 4 |
| IV. | PLAINTIFF'S EXPOSURE TO ROUNDUP | 4 |
| V. | STATUTE OF LIMITATIONS, DISCOVERY RULE, AND CONTRA NON-VALENTUM | 5 |
| VI. | FRAUD | 8 |
| | A. Registration of Pesticide / Herbicide Under Federal Law | 8 |
| | B. Monsanto's Fraud in the Marketing and Sale of Glyphosate / Roundup | 10 |
| VII. | DANGERS OF GLYPHOSATE | 12 |
| | A. Classification and assessment of Glyphosate by IARC | 14 |
| | B. Other Earlier Findings about Glyphosate's Danger to Human Health | 18 |
| | C. Release Patterns | 18 |
| | D.  Recent Worldwide bans of Roundup – Glyphosate | 19 |
| VIII. | STRICT LIABILITY - Claims for Exposure prior to the enactment of the Louisiana Products Liability Act | 20 |
| IX. | LOUISIANA PRODUCT LIABILITY ACT, Unreasonably Dangerous in Construction, Composition, Design, and Failure to Conform to Express Warranty | 24 |
| X. | NEGLIGENCE | 30 |
| XI. | DAMAGES | 34 |

## I.    PARTIES

1.  Plaintiff, **NOAH L. MORALES**, is a person of the full age of majority and who is domiciled in Jefferson Parish, Louisiana.

2.  Defendant Monsanto Company is a corporation created under the law of the State of Delaware, with its headquarters and principal place of business in St. Louis, Missouri.

## II.    JURISDICTION

3.  This Court has federal diversity Jurisdiction under 28 U.S.C. §1332 because complete diversity between the parties exists. The Plaintiff is a citizen of Alabama and Defendant Monsanto Company is incorporated in Delaware and has its principal placed of business in Missouri.

4.  The amount in controversy exceeds $75,000.00

5.  Mr. Morales alleges he developed cancer will using Round-Up, a Monsanto product, to treat his property in Jefferson Parish on a weekly basis.

6.  The Court has personal jurisdiction over Monsanto because Monsanto transacts business in the state.  Monsanto sells and distributes its Round-up products throughout Louisiana and thus avails itself of the laws and protection of the laws of Louisiana.

## III.   INTRODUCTION

7.   In 1970, Defendant Monsanto Company, Inc. ("Monsanto") discovered the herbicidal properties of glyphosate and began marketing it in products in 1974 under the brand name Roundup®. Roundup® is a non-selective herbicide used to kill weeks that commonly compete with the growing of crops. In addition to the active ingredient glyphosate, Roundup® contains the surfactant Polyethoxylated tallow amine (POEA) and/or adjuvants and other so-called "inert" ingredients. In 2001, glyphosate was the most used pesticide active ingredient in American agriculture with 85-90 million pounds used annually. That number grew to 185 million pounds in 2007.[1] As of 2013, glyphosate was the world's most widely used herbicide.

8.   Since it began selling Roundup®, Monsanto has represented it as safe to humans and the environment. Monsanto has repeatedly proclaimed and continues to proclaim to the world, and particularly to United States consumers, that glyphosate-based herbicides, including Roundup®, create no unreasonable risks to human health or to the environment.

## IV.   PLAINTIFF'S EXPOSURE TO ROUNDUP

9.   Plaintiff, Noah Morales, regularly used Roundup® when he cut the lawn at his home and business.  He used Roundup® weekly from the late 1970's to approximately 2011, each application took approximately 20 to 30 minutes.   Mr. Morales used a one-gallon sprayer bottle to apply the roundup to his property.

---

[1] Arthur Grube et al., U.S. Envtl. Prot. Agency, Pesticides Industry Sales and Usage, 2006-2007 Market Estimates 14 (2011), available at http://www.epa.gov/pesticides/pestsales/07pestsales/market_estimates2007.pdf

10. Mr. Morales purchased Roundup ® from local hardware stores.  He did not receive any warning that use of Roundup® could cause cancer. Nor was he warned to wear personal protective gear such as gloves, respirator or chemically resistant coveralls.

11. As a result of his exposure to Roundup®, Mr. Morales developed Non-Hodgkin's lymphoma.

12. Mr. Morales did not learn that his cancer could have been caused by his exposure to Roundup® until April of 2019.

13. Plaintiff could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products before or at the time of exposure.

## V.   STATUTE OF LIMITATIONS, DISCOVERY RULE, CONTRA NON-VALENTUM

14. Monsanto's Roundup is the proximate cause of Plaintiff's non-Hodgkin's lymphoma

15. Plaintiff had no way of knowing about the risk of serious illness association with the use of and/or exposure to Roundup® and glyphosate during the time he used the product and after.

16. Monsanto's deceptions and false and misleading advertising prevented Mr. Noah Morales from learning of the link between his non-Hodgkin's lymphoma and the Roundup he used, even after Mr. Morales diagnosis.

17. Within the time period of any applicable statute of limitations, Plaintiff could not have discovered, through the exercise of reasonable diligence, that exposure to Roundup and glyphosate would be injurious to his health.

18. Monsanto has known for decades that it falsely advertises the Safety of Roundup®

19. In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup®, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish. Among the representations the NYAG found deceptive and misleading about the human and environmental safety of Roundup® are the following:

   a)   Remember that environmentally friendly Roundup herbicide is biodegradable. It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences ...

   b)   And remember that Roundup is biodegradable and won't build up in the soil. That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, brush, edging or trimming problem.

   c)   Roundup biodegrades into naturally occurring elements.

   d)   Remember that versatile Roundup herbicide stays where you put it. That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

   e)   This non-residual herbicide will not wash or leach in the soil. It ... stays where you apply it.

   f)   You can apply Accord with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching. Then, soon after application, soil microorganisms biodegrade Accord into natural products.

g)  Glyphosate is less toxic to rats than table salt following acute oral ingestion.

h)  Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for workers who manufacture it or use it.

i)  You can feel good about using herbicides by Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j)  "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet dog standing in an area which has been treated with Roundup.[2]

20. On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with NYAG, in which Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a)  "its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk…."

b)  "its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Monsanto are biodegradable…"

---

[2] *In the Matter of Monsanto Company*, Attorney General of the State of New York Consumer Fraud and Production Bureau, New York, NY, November 1996.

c)   "its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means…"

d)   "its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e)   "glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides";

f)   "its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."[3]

21. Monsanto did not alter its advertising in the same manner in any state other than New York, and on information and belief still has not done so today

22. In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup®. The French court affirmed an earlier judgement that Monsanto had falsely advertised its herbicide Roundup® as "biodegradable" and that it "left the soil clean."

## VI.   FRAUD

### A.   REGISTRATION OF HERBICIDES UNDER FEDERAL LAW

23. The manufacture, formulation, and distribution of herbicides, such as Roundup®, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA" or

---

[3] *In the Matter of Monsanto Compan*y, Attorney General of the State of New York Consumer Fraud and Production Bureau, New York, NY, November 1996.

"Act"), 7 U.S.C. § 136 et seq. FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA" or "Agency") prior to their distribution, sale, or use, except as described by the Act. 7 U.S.C. § 136a(a).

24. Because pesticides and herbicides are toxic to plants, animals and humans the EPA requires as part of the registration process the results of a variety of tests to evaluate the products potential for toxicity to humans and other potential nontarget organisms, and other adverse effects on the environment. Registration by the EPA, is not an assurance or finding of safety. The determination the Agency must make in registering or re-registering a product is not that the product is "safe," but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136a(c)(5)(D).

25. FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(bb). FIFRA thus requires EPA to make a risk/benefit analysis in determining whether a registration should be granted or a pesticide allowed to continue to be sold in commerce.

26. FIFRA generally requires that the registrant, Monsanto in the case of Roundup®, conduct the health and safety testing of pesticide products. The EPA has protocols governing the conduct of tests required for registration and the laboratory practices that must be followed in conducting these tests. The data produced by the registrant must

be submitted to the EPA for review and evaluation. The government is not required, nor is it able, to perform all the product tests that are required of the manufacturer.

27. In the case of glyphosate, and therefore Roundup®, the EPA had planned on releasing its preliminary risk assessment – in relation to the reregistration process – no later than July 2015. The EPA completed its review of glyphosate in early 2015, but it delayed releasing the risk assessment pending further review in light of the WHO's health-related findings.

28. Based on the data and information Monsanto supplied, the EPA registered Roundup® for distribution, sale, manufacture in the United States.

### B.     MONSANTO'S FRAUD IN THE MARKETING AND SALE OF GLYPHOSATE/ROUNDUP ®

29. Based on early studies showing that glyphosate could cause cancer in laboratory animals, the EPA originally classified glyphosate as **possibly carcinogenic to humans (Group C)** in 1985. After pressure from Monsanto, including contrary studies it provided to the EPA, the EPA changed its classification to evidence of **non-carcinogenicity in humans (Group E)** in 1991.[4]

30. The studies Monsanto provided to the EPA were based on flawed and falsified data. After learning of the falsified and unreliable studies submitted by Monsanto and the

---

[4] U.S. Envtl. Prot. Agency, Memorandum, Subject: SECOND Peer Review of Glyphosate 1 (1991), available at https://www3.epa.gov/pesticides/chem_search/cleared_reviews/csr_PC-103601_30-Oct-91_265.pdf. [In re-classifying glyphosate to Group E (non-carcinogenicity), the EPA made clear that the designation did not mean the chemical does not cause cancer: "It should be emphasized, however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a definitive conclusion that the agent will not be a carcinogen under any circumstances."]

suggestion to pull all Roundup product from the Market, the EPA recognized that current law does not allow the EPA to pull a product from the market once it has been registered without specific evidence of the risk, the absence of reliable evidence of product safety is not enough.[5]

31. On two occasions, the EPA found that the laboratories hired by Monsanto to test the toxicity of its Roundup® products for registration purposes committed fraud.

32. In the first instance, Monsanto, in seeking initial registration of Roundup® by the EPA, hired Industrial Bio-Test laboratories ("IBT") to perform and evaluate toxicology studies relating to Roundup®.[6] IBT performed about 30 tests on glyphosate and glyphosate containing products, including nine (9) of the fifteen (15) residue studies needed to register Roundup®.

33. In 1976, the United States Food and Drug Administration ("FDA") performed an inspection of IBT that revealed discrepancies between the raw data and the final report relating to the toxicological impacts of glyphosate. The EPA subsequently audited IBT. It also found the toxicology studies conducted for the Roundup® herbicide to be

---

[5] U.S. Envtl. Prot. Agency, Summary of the IBT Review Program Office of Pesticide Programs (1983), available at https://nepis.epa.gov/Exe/ZyNET.exe/91014ULV.TXT?ZyActionD=ZyDocument&Client=EPA&Index=1981+Thru+1985&Docs=&Query=&Time=&EndTime=&SearchMethod=1&TocRestrict=n&Toc=&TocEntry=&QField=&QFieldYear=&QFieldMonth=&QFieldDay=&IntQFieldOp=0&ExtQFieldOp=0&XmlQuery=&File=D%3A%5Czyfiles%5CIndex%20Data%5C81thru85%5CTxt%5C00000022%5C91014ULV.txt&User=ANONYMOUS&Password=anonymous&SortMethod=h%7C-&MaximumDocuments=1&FuzzyDegree=0&ImageQuality=r75g8/r75g8/x150y150g16/i425&Display=hpfr&DefSeekPage=x&SearchBack=ZyActionL&Back=ZyActionS&BackDesc=Results%20page&MaximumPages=1&ZyEntry=1&SeekPage=x&ZyPURL
[6] Monsanto, Backgrounder, Testing Fraud: IBT and Craven Laboratories (Sep. 2, 2015, available at http://www.monsanto.com/products/documents/glyphosate-background-materials/ibt_craven_bkg.pdf.

invalid.[7] An EPA reviewer stated, after finding "routine" falsification of data" at IBT, that it was "hard to believe the scientific integrity of the studies when they said they took specimens of the uterus from male rabbits."[8]

34. Three top executives of IBT were convicted of fraud in 1983.

35. In the second incident of data falsification, Monsanto hired Craven Laboratories in 1991 to perform pesticide and herbicide studies, including for Roundup®. In that same year, the owner of Craven Laboratories and three of its employees were indicted and later convicted of fraudulent laboratory practices in the testing of pesticides and herbicides.[9]

36. Despite the falsity of the tests that underlie its registration, within a few years of the products launch, Monsanto was marketing Roundup® in 115 countries.

37. Through a three-pronged strategy of increasing production, decreasing prices, and by coupling with Roundup Ready® seeds, Roundup® became Monsanto's most profitable product. In 2000, Roundup® accounted for almost $2.8 billion in sales, outselling other herbicides by a margin of five to one and accounting for close to half of Monsanto's revenue.[10] Today, glyphosate remains one of the world's largest herbicides by sales volume.

---

[7] U.S. Envtl. Prot. Agency, Summary of the IBT Review Program Office of Pesticide Programs (1983)
[8] Marie-Monique Robin, The World According to Monsanto: Pollution, Corruption and the Control of the World's Food Supply (2011) (citing U.S. Envtl. Prot. Agency, Data Validation, Memo from K. Locke, Toxicology Branch, to R. Taylor, Registration Branch. Washington, D.C. (August 9, 1978)).
[9] Monsanto, Backgrounder, Testing Fraud: IBT and Craven Laboratories, supra.
[10] David Barboza, The Power of Roundup; A Weed Killer Is a Block for Monsanto to Build On, N.Y. TIMES, Aug. 2, 2001, available at http://www.nytimes.com/2001/08/02/business/the-power-of-roundup-a-weed-killer-is-a-block-formonsanto-to-build-on.html.

## VII.   DANGERS OF GLYPHOSATE

38. The herbicidal properties of glyphosate were discovered in 1970 by Monsanto chemist John Franz. The first glyphosate-based herbicide was introduced to the market in the mid-1970s under the brand name Roundup®. From the outset, Monsanto marketed Roundup® as a "safe" general-purpose herbicide for widespread commercial and consumer use; Monsanto still markets Roundup® as safe today.

39. According to WHO, the main ingredient of Monsanto's Roundup- glyphosate - is a probable cause of cancer to humans[11]. In March, 2015, seventeen (17) experts from eleven (11) countries met at the International Agency for Research on Cancer (IARC; Lyon, France) to assess the carcinogenicity of the organophosphate pesticides tetrachlorvinphos, parathion, malathion, diazinon, and glyphosate.[12] IARC results found Glyphosate to be a probable cause of cancer in humans. IARC concluded that the cancers most associated with glyphosate exposure are non-Hodgkin lymphoma ("NHL") and other haematopoietic cancers, including lymphocytic lymphoma/chronic lymphocytic leukemia, B-cell lymphoma, and multiple myeloma.[13]

40. Monsanto knew Roundup ® contained surfactants which could cause skin to absorb

---

[11] Guyton, Loomis, et al. Carcinogenicity of Tetrachlorvinphos, Parathion, Malathion, Diazinon, and Glyphosate, VOLUME 16, ISSUE 5, P490-491 (May 2015).

[12] Id.
[13] Id.

greater quantities of glyphosate.

41. Monsanto also knew Roundup® also contains low levels of Formaldehyde.

42. Monsanto repeatedly told government agencies, farmers and the general population that Roundup® is safe.

43. Plants treated with glyphosate, the main ingredient in Roundup®, translocate the systemic herbicide to their roots, shoot regions, and fruit, where it interferes with the plant's ability to form aromatic amino acids necessary for protein synthesis. Treated plants generally die within two to three days. Because plants absorb glyphosate, it cannot be completely removed by washing or peeling produce or by milling, baking, or brewing grains. For decades, individuals such as the Plaintiff used Roundup unaware and unwarned of the potential health risk associated with and caused by the active ingredient glyphosate.

A.       CLASSIFICATIONS AND ASSESSMENT OF GLYPHOSATE BY IARC

44. The IARC process for the classification of glyphosate followed the stringent procedures for the evaluation of a chemical agent. Over time, the IARC Monograph program has reviewed 980 agents. Of those reviewed, it has determined 116 agents to be Group 1 (Known Human Carcinogens); 73 agents to be Group 2A (Probable Human Carcinogens); 287 agents to be Group 2B (Possible Human Carcinogens); 503 agents to be Group 3 (Not Classified); and one agent to be Probably Not Carcinogenic.

45. The established procedure for IARC Monograph evaluations is described in the IARC Programme's Preamble. Evaluations are performed by panels of international experts, selected on the basis of their expertise and the absence of actual or apparent conflicts of interest.

46. One year before the Monograph meeting, the meeting is announced and there is a call both for data and for experts. Eight months before the Monograph meeting, the Working Group membership is selected and the sections of the Monograph are developed by the Working Group members. One month prior to the Monograph meeting, the call for data is closed and the various draft sections are distributed among Working Group members for review and comment. Finally, at the Monograph meeting, the Working Group finalizes review of all literature, evaluates the evidence in each category, and completes the overall evaluation. Within two weeks after the Monograph meeting, the summary of the Working Group findings is published in Lancet Oncology, and within a year after the meeting, the final Monograph is finalized and published.

47. In assessing an agent, the IARC Working Group reviews the following information:

    a)    human, experimental, and mechanistic data;

    b)    all pertinent epidemiological studies and cancer bioassays; and

    c)    representative mechanistic data. The studies must be publicly available and have sufficient detail for meaningful review, and reviewers cannot be associated with the underlying study.

48. In March 2015, IARC reassessed glyphosate. The summary published in The Lancet Oncology reported that glyphosate is a Group 2A agent and probably carcinogenic in humans.

49. On July 29, 2015, IARC issued its Monograph for glyphosate, Monograph 112. For Volume 112, the volume that assessed glyphosate, a Working Group of 17 experts from 11 countries met at IARC from March 3-10, 2015 to assess the carcinogenicity of certain herbicides, including glyphosate. The March meeting resulted in a comprehensive review of the latest available scientific evidence related to the carcinogenicity of glyphosate by the IARC Secretariat and the Working Group.  According to published procedures, the Working Group considered "reports that have been published or accepted for publication in the openly available scientific literature" as well as "data from governmental reports that are publicly available."

50. The studies considered the following exposure groups: occupational exposure of farmers and tree nursery workers in the United States, forestry workers in Canada and Finland and municipal weed-control workers in the United Kingdom; and para-occupational exposure in farming families.

51. Glyphosate was identified as the second-most used household herbicide in the United States for weed control between 2001 and 2007 and the most heavily used herbicide in the world in 2012.

52. Exposure pathways are identified as air (especially during spraying), water, and food. Community exposure to glyphosate is widespread and found in soil, air, surface water, and groundwater, as well as in food.

53. The assessment of the IARC Working Group identified several case control studies of occupational exposure in the United States, Canada, and Sweden. These studies show a human health concern from agricultural and other work-related exposure to glyphosate.

54. The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin lymphoma ("NHL") and several subtypes of NHL, and the increased risk persisted after adjustment for other pesticides.

55. The IARC Working Group also found that glyphosate caused DNA and chromosomal damage in human cells. One study in community residents reported increases in blood markers of chromosomal damage (micronuclei) after glyphosate formulations were sprayed.

56. In male CD-1 mice, glyphosate induced a positive trend in the incidence of a rare tumor, renal tubule carcinoma. A second study reported a positive trend for hemangiosarcoma in male mice. Glyphosate increased pancreatic islet-cell adenoma in male rats in two studies. A glyphosate formulation promoted skin tumors in an initiation-promotion study in mice.

57. The IARC Working Group also noted that glyphosate has been detected in the urine of agricultural workers, indicating absorption. Soil microbes degrade glyphosate to aminomethylphosphoric acid (AMPA). Blood AMPA detection after exposure suggests intestinal microbial metabolism in humans.

58. The IARC Working Group further found that glyphosate and glyphosate formulations induced DNA and chromosomal damage in mammals, and in human and animal cells in utero.

59. The IARC Working Group also noted genotoxic, hormonal, and enzymatic effects in mammals exposed to glyphosate. Essentially, glyphosate inhibits the biosynthesis of aromatic amino acids, which leads to several metabolic disturbances, including the inhibition of protein and secondary product biosynthesis and general metabolic disruption.

60. The IARC Working Group also reviewed an Agricultural Health Study, consisting of a prospective cohort of 57,311 licensed pesticide applicators in Iowa and North Carolina. While this study differed from others in that it was based on a self-administered questionnaire, the results support an association between glyphosate exposure and Multiple Myeloma, Hairy Cell Leukemia (HCL), and Chronic Lymphocytic Leukemia (CLL), in addition to several other cancers.

**B.     Other Earlier Findings About Glyphosate's Dangers to Human Health**

61. The EPA has a technical fact sheet, as part of its Drinking Water and Health, National Primary Drinking Water Regulations publication, relating to glyphosate. This technical fact sheet predates the IARC March 20, 2015, evaluation. The fact sheet describes the release patterns for glyphosate as follows:

**C.     Release Patterns**

62. Glyphosate is released to the environment in its use as an herbicide for controlling woody and herbaceous weeds on forestry, right-of-way, cropped and non-cropped sites. These sites may be around water and in wetlands. It may also be released to the

environment during its manufacture, formulation, transport, storage, disposal and cleanup, and from spills. Since glyphosate is not a listed chemical in the Toxics Release Inventory, data on releases during its manufacture and handling are not available. Occupational workers and home gardeners may be exposed to glyphosate by inhalation and dermal contact during spraying, mixing, and cleanup. They may also be exposed by touching soil and plants to which glyphosate was applied. Occupational exposure may also occur during glyphosate's manufacture, transport storage, and disposal.

63. In 1995, the Northwest Coalition for Alternatives to Pesticides reported that in California, the state with the most comprehensive program for reporting of pesticide-caused illness, glyphosate was the third most commonly-reported cause of pesticide illness among agricultural workers.

**D.    Recent Worldwide Bans on Roundup®/Glyphosate**

64. Several countries around the world have instituted bans on the sale of Roundup® and other glyphosate-containing herbicides, both before and since IARC first announced its assessment for glyphosate in March 2015. More countries undoubtedly will follow suit as the dangers of the use of Roundup® become more widely known. The Netherlands issued a ban on all glyphosate-based herbicides in April 2014, including Roundup®, which takes effect by the end of 2015. In issuing the ban, the Dutch Parliament member who introduced the successful legislation stated: "Agricultural pesticides in user-friendly packaging are sold in abundance to private persons. In garden centers,

Roundup® is promoted as harmless, but unsuspecting customers have no idea what the risks of this product are. Especially children are sensitive to toxic substances and should therefore not be exposed to it."

65. The Brazilian Public Prosecutor in the Federal District requested that the Brazilian Justice Department suspend the use of glyphosate.

66. France banned the private sale of Roundup® and glyphosate following the IARC assessment for Glyphosate.

67. Bermuda banned both the private and commercial sale of glyphosates, including Roundup®. The Bermuda government explained its ban as follows: "Following a recent scientific study carried out by a leading cancer agency, the importation of weed spray 'Roundup' has been suspended."

68. The Sri Lankan government banned the private and commercial use of glyphosates, particularly out of concern that Glyphosate has been linked to fatal kidney disease in agricultural workers.

69. The government of Columbia announced its ban on using Roundup® and glyphosate to destroy illegal plantations of coca, the raw ingredient for cocaine, because of the WHO's finding that glyphosate is probably carcinogenic.

## VIII.  STRICT LIABILITY

### Claims for Exposure prior to the enactment of the Louisiana Products Liability Act

70. Prior to the enactment of the Louisiana Product Liability Act in September 1, 1988,[14] a manufactures responsibility for injuries caused by its product was governed by negligence and the strict liability standard enumerated by the Louisiana Supreme Court in *Weber v. Fidelity & Casualty Ins. Co. of N.Y* and *Halphen v. Johns-Manville Sales Corp.*,1986).[15]

71. When the tortuous exposure to a hazardous substance occurs before the Louisiana Product liability Acts (LPLA's) effective date (September 1, 1988), where the exposure is significant and such exposure later results in the manifestation of damages, pre-Act law applies.[16]

72. Mr. Morales injuries and exposure to Roundup began in the late 1970's, and continued through 1988 and beyond.  His weekly application of roundup to his property and business in the summer and biweekly application in the winter caused significant exposure which later resulted in the manifestation of damages. Therefore, pre-LPLA law applies to his claims against the manufacturer for negligence and strict liability.

---

[14] *Halphen v. Johns-Manville Sales Corp.*  484 So.2d 110, 117 (La.,1986)., and La. R.S. 9:2800:51 et seq.
[15] *Weber v. Fidelity & Casualty Insurance Company of New York,* 259 La. 599, 250 So.2d 754 (1971); *Halphen v. Johns-Manville Sales Corp.*  484 So.2d 110, 117 (La. 1986).
[16] *Austin v. Abney Mills*, 824 so. 2d 1137, 1154 (LA, 2002), see also *Cole v. Celotex Corp.,* 599 So.2d 1058, 1066 (La.1992); *Asbestos v. Bordelon, Inc.*, 726 So.2d 926, 940, 1996-0525 (La.App. 4 Cir. 10/21/98).

73. A reasonable person, considering the evidence, would conclude that the danger in-fact of Roundup products, whether foreseeable or not, out-weighs the utility of the product, therefore Monsanto's Roundup products were ***unreasonably dangerous per se.***

74. Monsanto ***failed to provide adequate warning*** of the dangers inherent in the normal use of Roundup products which were not obvious to the ordinary user.

75. Monsanto's product was ***unreasonably dangerous in design.***

76. Monsanto's defective design of Roundup® products was willful, wanton, fraudulent, malicious, and conducted with reckless disregard for the health and safety of users of the Roundup® products, including the Plaintiffs herein.

77. Monsanto's conduct, as described above, was reckless. Monsanto risked the lives of consumers and users of its products, including Plaintiffs, with knowledge of the safety problems associated with Roundup® and glyphosate-containing products, and suppressed this knowledge from the general public. Monsanto made conscious decisions not to redesign, warn, or inform the unsuspecting public. Monsanto's reckless conduct warrants an award of aggravated damages.

78. The harm caused by Roundup® products far outweighed their benefit, rendering these products dangerous to an extent beyond that which an ordinary consumer would contemplate. Roundup® products were and are more dangerous than alternative products and Monsanto could have designed Roundup® products (including their packaging and sales aids) to make them less dangerous. Indeed, at the time that Monsanto designed

Roundup® products, the state of the industry's scientific knowledge was such that a less
risky design or formulation was attainable.

79. At all times relevant to this litigation, Monsanto failed to investigate, study, test, or
promote the safety or to minimize the dangers to users and consumers of its product
and to those who would foreseeably use or be harmed by these herbicides, including
Plaintiffs.

80. As a manufacture, Monsanto had a duty to test and inspect its product, and the extent
of the research and experimentation must be commensurate with the dangers
involved."[17] Monsanto breached this duty.

81. Despite the fact that Monsanto knew or should have known that Roundup® posed a
grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks
associated with use and exposure. The dangerous propensities of these products and
the carcinogenic characteristics of glyphosate, as described above, were known to
Monsanto, or scientifically knowable to Monsanto through appropriate research
and testing by known methods, at the time it distributed, marketed, promoted,
supplied, or sold the product, and not known to end users and consumers, such as
Plaintiffs.

---

[17] *Hopper v. Crown*, 93-2021 (La. App. 1 Cir. 10/7/94), 646 So. 2d 933, 944, *writ denied*, 95-
0179 (La. 3/17/95), 651 So. 2d 275 citing *Halphen,* 484 So.2d at 115 .

IX.    **LOUISIANA PRODUCT LIABILITY ACT, Unreasonably Dangerous in Construction, Composition, Design, and Failure to Conform to Express Warranty**

82. Plaintiffs bring this strict liability claim against Monsanto for its product Roundup because it is (1) unreasonably dangerous in construction and composition; (2), unreasonably dangerous design; (3) unreasonably dangerous because of nonconformity to its express warranty; (4) and unreasonably dangerous because of inadequate warning.

83. Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

84. Mr. Noah Morales exposure to Monsanto's product, Roundup®, resulted from the normal, foreseeable, and intended use of the products, without change in the condition in which the product was supplied to re-sellers.  At all times relevant to this litigation, Roundup® products reached the intended consumers and users without substantial change in their condition as designed, manufactured, sold, distributed, labeled, promoted, and marketed by Monsanto.

85. The defendant product, Roundup®, was defective, presented an unreasonable risk of harm, and was unreasonably dangerous under normal use at the time the products left the Monsanto's control.

86. Mr. Morales was an intended and foreseeable user of the alleged defective product and Monsanto could reasonably have anticipated the injuries to the Plaintiff.

87. Plaintiff incorporates herein the Definitions provided by the Louisiana Product Liability act, found in La. R.S. §2800.53, including:

> "Manufacturer" means a person or entity who is int the business of manufacturing a product for placement into trade or commerce. "Manufacturing a product" means producing, making fabricating, constructing, designing, remanufacturing, reconditioning or refurbishing a product……"

88. At all times relevant to this litigation, Monsanto Corporation was a manufacturer engaged in the business of designing, manufacturing, selling, distributing, and marketing of Roundup® products used by the Plaintiff.

89. At all times herein the inherent characteristic (known to Monsanto) of Roundup® that gave the product such a potential for causing health problems rendered the product unreasonably dangerous per se.

90. Roundup® was unreasonably dangerous in **construction and composition** because at the time if left Monsanto Company's facilities the product contained surfactants that Monsanto knew would increase skin absorption of glyphosate, the product contained the cancer causing substance glyphosate, the product contained arsenic (a known toxin and carcinogen), and formaldehyde (a known toxin and carcinogen). These characteristics deviated from the products specifications and manufacturer's performance standards.

91. Roundup® was unreasonably dangerous in **design** because the gravity of the probable damage caused by the product outweighed the usefulness of the product. As packages

and sold, the warning and precautions for use were inadequate to prevent or mitigate the risk of injury to reasonably foreseeable users of the product using the product in the manner anticipated by Monsanto.

92. Roundup® was unreasonably dangerous in **design** because it contained glyphosate a probable human carcinogen, surfactants that Monsanto knew would increase skin absorption of the product, contains arsenic (a known toxic and carcinogen), and formaldehyde (a known carcinogen).

93. Roundup® was unreasonably dangerous by **design** because it was designed to be sold for use to consumers without wearing personal protective gear such as gloves, respirators, and other protective gear.

94. Roundup® was unreasonable dangerous in **design** because it failed to use nontoxic alternative to the glyphosate and other chemicals used to manufacture Roundup®.

95. Roundup® is unreasonably dangerous because it fails to conform to with the **express warranty** provided by the manufacture, Monsanto.

96. Monsanto advertised and expressly warranted Roundup® as "safe", "non-toxic", "harmless", "biodegradable", non-leaching and "safer than table salt".[18]

---

[18] *In the Matter of  Monsanto Compan*y, Attorney General of the State of New York Consumer Fraud and Production Bureau, New York, NY, November 1996.

97. As a manufacture, Monsanto had a duty to test and inspect its product, and the extent of the research and experimentation must be commensurate with the dangers involved."[19] Monsanto breached this duty.

98. Monsanto's **failed to adequately warn** users of the dangers of the product and failure to warn users to wear suitable personal protective gear also cause this product to be unreasonably dangerous in design.

99. Monsanto had a duty to warn of the risks associated with the use of Roundup® products. Monsanto failed to provide adequate warnings.

100.    At all times relevant to this litigation, Monsanto had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain supply, provide proper warnings, and take such steps as necessary to ensure that Roundup® products did not cause users and consumers to suffer from unreasonable and dangerous risks. Monsanto had a continuing duty to warn the Plaintiffs of the dangers associated with Roundup® use and exposure. Monsanto, as manufacturer, seller, promoter, marketer, or distributor of chemical herbicides are held to the knowledge of an expert in the field.

101.    At the time of manufacture, Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup® and glyphosate-

---

[19] *Hopper v. Crown*, 93-2021 (La. App. 1 Cir. 10/7/94), 646 So. 2d 933, 944, *writ denied*, 95-0179 (La. 3/17/95), 651 So. 2d 275 citing *Halphen,* 484 So.2d at 115 .

containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

102.   At all times relevant to this litigation, Monsanto failed to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of its product and to those who would foreseeably use or be harmed by these herbicides, including Plaintiffs.

103.   Despite the fact that Monsanto knew or should have known that Roundup® posed a grave risk of harm, it failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of these products and the carcinogenic characteristics of glyphosate, as described above, were known to Monsanto, or scientifically knowable to Monsanto through appropriate research and testing by known methods, at the time it distributed, marketed, promoted, supplied, or sold the product, and not known to end users and consumers, such as Plaintiffs.

104.   At all times relevant to this litigation, Mr. Morales used was exposed to Roundup® products in its intended or reasonably foreseeable manner without knowledge of their dangerous characteristics.

105.   Plaintiffs could not have reasonably discovered the defects and risks associated with Roundup® or glyphosate-containing products prior to or at the time of Plaintiffs' exposure. Plaintiffs relied upon the skill, superior knowledge, and judgment of Monsanto.

106.    The information that Monsanto did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Plaintiffs to utilize the products safely and with adequate protection. Instead, Monsanto disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Roundup® and glyphosate; continued to aggressively promote the efficacy of its products, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of exposure to Roundup® and glyphosate.

107.    To this day, Monsanto has failed to adequately and accurately warn of the true risks of Mr. Morale' injuries associated with the use of and exposure to Roundup® and its active ingredient glyphosate, a probable carcinogen.

108.    The defects in Roundup® products caused or contributed to cause Plaintiffs' injuries, and, but for this misconduct and omissions, Plaintiffs would not have sustained their injuries.

109.    Had Monsanto provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with Roundup® products, Plaintiffs could have avoided the risk of developing injuries as alleged herein.

110.    As a direct and proximate result of Monsanto placing defective Roundup® products into the stream of commerce, Plaintiffs have suffered severe injuries and have endured

physical pain and discomfort, as well as economic hardship, including considerable financial expenses for medical care and treatment.

## X.  NEGLIGENCE

111.    Plaintiffs incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully stated herein.

112.    Monsanto is liable to Plaintiffs for injuries caused by its negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of these products and the risks associated with the use of or exposure to Roundup® and glyphosate.

113.    At all times relevant to this litigation, Monsanto had a duty to:

    a. exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Roundup® products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

    b. exercise reasonable care in the marketing, advertisement, and sale of the Roundup® products. Monsanto's duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Roundup® and appropriate, complete, and accurate warnings concerning the potential adverse effects of exposure to Roundup®, and, in particular, its active ingredient glyphosate.

114.    At all times relevant to this litigation, Monsanto knew or, in the exercise of reasonable care, should have known:

    a.    of the hazards and dangers of Roundup® and specifically, the carcinogenic properties of the chemical glyphosate.

    b.    that use of or exposure to its Roundup® products could cause or be associated with Plaintiffs' injuries and thus created a dangerous and unreasonable risk of injury to the users of these products, including Plaintiffs.

    c.    that users and consumers of Roundup® were unaware of the risks and the magnitude of the risks associated with use of and/or exposure to Roundup® and glyphosate-containing products.

115.    As such, Monsanto breached the duty of to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of its Roundup® products.  Monsanto manufactured, marketed, promoted, and sold defective herbicides containing the chemical glyphosate, knew or had reason to know of the defects inherent in these products, knew or had reason to know that a user's or consumer's exposure to the products created a significant risk of harm and unreasonably dangerous side effects, and failed to prevent or adequately warn of these risks and injuries.

116.    Despite an ability and means to investigate, study, and test these products and to provide adequate warnings, Monsanto has failed to do so. Monsanto has wrongfully concealed information and has further made false and/or misleading statements concerning the safety and/or exposure to Roundup® and glyphosate.

117.   Monsanto was negligent in the following respects:

    a. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing its Roundup® products without thorough and adequate pre- and post-market testing;

    b. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Roundup® while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of exposure to glyphosate, and, consequently, the risk of serious harm associated with human use of and exposure to Roundup®;

    c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Roundup® products and glyphosate-containing products were safe for their intended use in agriculture and horticulture;

    d. Failing to use reasonable and prudent care in the design, research, manufacture, and development of Roundup® products so as to avoid the risk of serious harm associated with the prevalent use of Roundup®/glyphosate as an herbicide;

    e. Failing to design and manufacture Roundup® products so as to ensure they were at least as safe and effective as other herbicides on the market; Failing to provide adequate instructions, guidelines, and safety precautions to those persons who Monsanto could reasonably foresee would use and be exposed to its Roundup® products;

f. Failing to disclose to Plaintiffs, users/consumers, and the general public that use of and exposure to Roundup® presented severe risks of cancer and other grave illnesses;

g. Failing to warn Plaintiffs, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative herbicides available to Plaintiff and other consumers;

h. Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Roundup® and glyphosate-containing products;

i. Representing that its Roundup® products were safe for their intended use when, in fact, Monsanto knew or should have known that the products were not safe for their intended purpose;

j. Declining to make or propose any changes to Roundup® products' labeling or Other promotional materials that would alert the consumers and the general public of the risks of Roundup® and glyphosate;

k. Advertising, marketing, and recommending the use of the Roundup® products, while concealing and failing to disclose or warn of the dangers known by Monsanto to be associated with or caused by the use of or exposure to Roundup® and glyphosate;

l. Continuing to disseminate information to its consumers, which indicate or imply that Monsanto's Roundup® products are not unsafe for use in the agricultural and horticultural industries; and

m. Continuing the manufacture and sale of its products with the knowledge that the products were unreasonably unsafe and dangerous.

118.    Monsanto should have known that it was foreseeable that consumers such as Mr. Morales would suffer injuries as a result of Monsanto's failure to exercise ordinary care in the manufacturing, marketing, promotion, labeling, distribution, and sale of Roundup®.

119.    Monsanto's negligence was the proximate cause of the injuries, harm, and economic losses that the Plaintiff suffered, as described herein.

120.    As a proximate result of Monsanto's wrongful acts and omissions in placing defective Roundup® products into the stream of commerce without adequate warnings of the hazardous and carcinogenic nature of glyphosate, Plaintiff has suffered severe and permanent physical and emotional injuries. Plaintiff has endured pain and suffering and have suffered economic losses (including significant expenses for medical care and treatment).

## XI.    DAMAGES

121.    Plaintiff is entitled to recover the following damages as a result of Monsanto's Negligence, fraud and violations of the Louisiana Product Lability Act.

122.    all past, present and future medical costs or expenses related thereto;

123.    all past, present and future lost earnings;

124.    all past, present and future mental suffering, anguish and pain sustained by

Petitioner;

125.    all past, present and future physical pain and suffering sustained by Petitioner;

126.    the disfigurement suffered by Petitioner;

127.    loss of quality of life;

128.    past, present, and future disability.

129.    all other forms of relief or categories of damages allowed by Louisiana law

for survival claims, with interest from the date of injury until paid, plus costs of

these proceedings.

130.    Due to Monsanto's reckless disregard for public safety in its instructions for

the storage and handling of the hazardous and/ or toxic substance, Roundup,

Plaintiff is entitled to recover Exemplary Damages for his exposure to

Monsanto's Roundup during the time period from September 1, 1984 to April 16,

1996. [20] **[Former La. Civ. Code art. 2315.3 was effective from September 1,**

**1984 through April 16, 1996.]**

---

[20] See Former La. Civ. Code art. 2315.3, effective from September 1,1984 to April 16, 1996.

**WHEREFORE,** Plaintiff, **NOAH MORALES** prays for issuance of citation and service of process upon defendant, **MONSANTO COMPANY** and after due proceedings are had, there be judgment herein in favor of Plaintiff and against Defendant, **MONSANTO COMPANY** in principal sum which is sufficient and adequate to justly, fairly and legally compensate Plaintiff for all his losses and injuries together with legal interest thereon from the date of judicial demand and for all cost of these proceedings.

Plaintiff further prays for all general and equitable relief as this Court may deem lawful, necessary, proper or just.

Respectfully submitted,

*s/ Amber E. Cisney*
**Richard J. Fernandez, LLC**
**Amber E. Cisney (La. 28821)**
**Law Office of Richard J. Fernandez, LLC**
3000 West Esplanade Ave., Ste. 200
Metairie, LA 70002
Telephone (504)834-8500
Facsimile (504)-834-1511
E-mail:     rick@rjfernandezlaw.com

amber@amlbenzene.net

**ATTORNEYS FOR PLAINTIFFS**

PLEASE SERVE:
**Monsanto Company**
Through its agent for service of process
Corporation Service Company
501 Louisiana Ave.
Baton Rouge, LA 70802